UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Nancy Chun, M.D. ) | Case No. _____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| The General Hospital Corporation, ) | |
| Massachusetts General Physician ) | |
| Organization, Inc., SolutionHealth, ) | |
| Southern New Hampshire Medical Center, ) | |
| Foundation Medical Partners, Southern ) | |
| New Hampshire Health System, ) | |
| and Michael DeLeo, III, M.D. ) | |
| ) | |
| Defendants ) | |

## <u>COMPLAINT</u>

Dr. Nancy Chun is an unwavering champion of patient safety.  As Medical Director of the MGH/SNHMC Hematology/Oncology Practice, overseeing safety and quality were some of Dr. Chun's primary responsibilities.  During her tenure as Medical Director, and after as a staff physician, Dr. Chun raised numerous safety and quality concerns about patient care, including concerns about safety and quality issues with two of her colleagues, Drs. Gautami Rao and Cherif Abdelmalek.

On a Friday afternoon in September 2021, shortly after Solution Health Cancer Institute's new Executive Director started, Dr. Chun received an urgent call from Dr. Joel Schwartz, during which he placed her on an immediate leave.  Dr. Chun learned that MGH had received a complaint from Drs. Rao and Abdelmalek about the quality of care Dr. Chun was providing to her patients.  The complaint prompted Dr. Schwartz to have 20 of Dr. Chun's charts reviewed by her peers at MGH.  Dr. Schwartz informed Dr. Chun that four of the 20 charts, 20% he

emphasized, did not meet the standard of care. This shocked Dr. Chun because it was not consistent with her efforts to provide the highest quality care to her patients. Sure enough, when Dr. Chun reached out to the physicians who had reviewed her charts, they told her that they did not find anything substandard.

Upon Dr. Chun's return, her Medical Assistant told her that Dr. Abdelmalek was fuming mad about Dr. Chun's return. And, during Dr. Chun's leave, Dr. Rao had told at least one of Dr. Chun's patients that Dr. Chun would not be returning. On September 27, 2021, Dr. Chun sent an email to Dr. Schwartz and Dr. DeLeo, among others, in which she raised concerns about Dr. Abdelmalek's treatment of her and asked "Is it because I'm female, Asian, I don't live up to his biases about physicians?" Dr. Chun referenced safety and quality concerns about Dr. Rao's and Dr. Abdelmalek's practice and then wrote: "These are all quality issues that I have had to address as Medical Director and therefore, I can't seem to think that this is some form of retaliation." Dr. Chun continued, "I would like to summarize that I have a right to work in a non-threatening, non-toxic environment without fear of any retaliation because I have done nothing wrong. We should all work towards a diverse and inclusive work environment that allows everyone to achieve their highest potential. I expect MGH and Solution to support me in their institutions' core values." Unfortunately, they did not.

Despite finding no issues with Dr. Chun's charts, weeks later, Defendants compelled Dr. Chun to step down as Medical Director of the MGH/SNHMC Hematology/Oncology Practice effective October 11, 2021.

This retaliation could not deter Dr. Chun's commitment to patient safety. Even after stepping down as Medical Director, Dr. Chun raised concerns when she became aware of them, which was often. However, Dr. Chun's concerns were met with skepticism and inaction and

earned her the label of being "disruptive." In sum, Defendants expected Dr. Chun to conform to the offensive stereotype that Asian women, like herself, are docile, complicit, and subservient. But, those are not words that describe Dr. Chun. She is a strong, assertive, fearless advocate for her patients.

On July 29, 2022, Dr. David Ryan, Chief of Hematology/Oncology and Clinical Director of Mass General Cancer Center, placed Dr. Chun on an administrative leave for alleged "disruptive behavior." That leave ended when Defendants constructively terminated Dr. Chun's employment.

Dr. Chun brings this lawsuit because Defendants retaliated against her for advocating for patient safety and discriminated against her because her tireless pursuit of safe, quality, care for the patients of the MGH/SNHMC Hematology/Oncology Practice did not conform to Defendants' racist and sexist stereotypes of what an Asian female physician must be.

## Parties

1.       The Plaintiff, Nancy Chun, M.D., resides at 12 Mason Street, Winchester, MA 01890.

2.       Defendant The General Hospital Corporation d/b/a Massachusetts General Hospital (hereinafter "MGH") is a foreign nonprofit corporation with a principal place of business of 55 Fruit Street, Boston, MA 02114. MGH's Registered Agent is CT Corporation System, 2-1/2 Beacon Street, Concord, NH 03301.

3.       Defendant Massachusetts General Physician Organization, Inc. (hereinafter "MGPO") is a foreign nonprofit corporation with a principal place of business of 55 Fruit Street, Boston, MA 02114. MGPO's Registered Agent is CT Corporation System, 2-1/2 Beacon Street, Concord, NH 03301.

4.      Defendant SolutionHealth (hereinafter "SH") is a domestic nonprofit corporation with a principal place of business of 360 Route 101, Suite 8, Bedford, NH 03110.

5.      Defendant Southern New Hampshire Medical Center (hereinafter "SNHMC") is a domestic nonprofit corporation with a principal place of business of 8 Prospect Street, Nashua, NH 03060.

6.      Defendant Foundation Medical Partners (hereinafter "FMP") is a domestic nonprofit corporation with a principal place of business of 8 Prospect Street, Nashua, NH 03060.

7.      Defendant Southern New Hampshire Health System (hereinafter "SNHHS") is a domestic nonprofit corporation with a principal place of business of 8 Prospect Street, Nashua, NH 03060.

8.      Defendant Michael J.  DeLeo, III, MD, is an individual with an address of 24 Taft Drive, Winchester, Massachusetts, 01890-3748.

9.      Dr. Chun brings this lawsuit against MGH, MGPO, SH, SNHMC, FMP, and SNHHS because, upon information and belief, they constitute a "single integrated employer."

10.      Upon information and belief, during Dr. Chun's employment, MGH, MGPO, SH, SNHMC, FMP, and SNHHS had centralized control over labor relations, interrelation of operations, there was common management between MGH, MGPO, SH, SNHMC, FMP, and SNHHS and there was common ownership between MGH, MGPO, SH, SNHMC, FMP, and SNHHS.

11.      The "single employer doctrine" allows "two nominally separate companies" to be subject to liability where the companies are "so interrelated that they constitute a single employer subject to liability." *Torres-Negron v. Merck & Co., Inc*., 488 F.3d 34, 40-41 (1st Cir. 2007) (applying single employer test to determine liability under Title VII and ADA).

4

12.    Courts consider the following four factors to determine whether two or more entities count as a single employer in the widely recognized integrated-enterprise test:  (i) "centralized control over labor relations"; (ii) "interrelation between operations";  (iii) "common management"; and (iv) "common ownership."   "Two entities may be considered to be a single employer under the integrated enterprise test if there is sufficient interrelation of operations, common management, centralized control of labor decisions, and common ownership."  *Torres-Negron* at 42 & n. 8 (citing *Romano v. U-Haul Int'l*, 233 F.3d 655, 662 (1st Cir. 2000)).  *See also Burnett v. Ocean Properties, Ltd*., 987 F.3d 57 (1st Cir. 2021).

13.    Upon information and belief, MGH, MGPO, SH, SNHMC, FMP, and SNHHS will meet the test for applicability of the single integrated employer doctrine.

## **Jurisdiction and Venue**

14.    At all times relevant hereto, each Defendant has engaged in an industry affecting commerce.

15.    MGH has had more than 500 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

16.    MGPO has had more than 500 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

17.    SH has had more than 500 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

18.    SNHMC 500 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

19.    FMP has had more than 300 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

20.     SNHHS has had more than 500 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

21.     At all relevant times, Dr. David Ryan was the Chief of Hematology/Oncology and Clinical Director of the Mass General Cancer Center.

22.     At all relevant times, Dr. Joel Schwartz was the Clinical Director of the MGH Medical Oncology Network.

23.     At all relevant times, Dr. Michael DeLeo was Chief Medical Officer of FMP of SNHHS.

24.     At all relevant times, Mara Bloom was Vice President of the MGH Cancer Center.

25.     At all relevant times, Marsha Clements was the Executive Director of the SH Cancer Center.

26.     At all relevant times, Rebecca Cooper-Piela was Chief Quality Officer for SNHHS.

27.     At all relevant times, Beth Souza was Director of the MGH Cancer Center.

28.     At all relevant times, Kathy Hamson was the Practice Manager of Foundation Hematology/Oncology.

29.     Venue is proper because the unlawful acts complained of were committed within the State of New Hampshire.

30.     On or about January 10, 2023, Dr. Chun filed a Charge of Discrimination and Retaliation (hereinafter "Charge") with the New Hampshire Human Rights Commission and the Equal Opportunity Commission.

31.     Dr. Chun's Charge was filed with the New Hampshire Human Rights Commission and the Equal Employment Opportunity Commission within 180 days after the unlawful employment acts were committed.

32.     On December 12, 2023, the Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue with respect to her charges of discrimination, thus satisfying the procedural prerequisites established by 42 U.S.C. 2000(e) - 5(b) and (3).  *See* Exhibit A, Notice of Right to Sue, attached hereto and incorporated herein by reference.

33.     This Complaint is filed fewer than 90 days after receipt of the Notice of Right to Sue, dated December 12, 2023 (as attached).

## Facts

34.      Dr. Chun entered into an employment agreement with MGH, MGPO, and SNHMC on August 17, 2017. Exhibit B.

35.     Dr. Chun began working for MGH on or about March 1, 2018, and continued her work there until the unlawful constructive termination of her employment on October 7, 2022.

36.     Dr. Chun began working for MGPO on or about March 1, 2018, and continued her work there until the unlawful constructive termination of her employment on October 7, 2022.

37.     Dr. Chun began working for SH on or after April 30, 2018, and continued her work there until the unlawful constructive termination of her employment on October 7, 2022.

38.     Dr. Chun began working for SNHMC on or about March 1, 2018, and continued her work there until the unlawful constructive termination of her employment on October 7, 2022.

39.     Dr. Chun began working for FMP on or about March 1, 2018, and continued her work there until the unlawful constructive termination of her employment on October 7, 2022.

40.     Dr. Chun began working for SNHHS on or about March 1, 2018, and continued her work there until the unlawful constructive termination of her employment on October 7, 2022.

41.     Dr. Chun was hired to the position of Medical Director of Foundation Hematology/Oncology ("the Clinic"), which subsequently became a part of SolutionHealth Cancer Institute.  Dr. Chun's title was Medical Director of the MGH/SNHMC Hematology/Oncology Practice ("the Clinic").

42.     In that role, Dr. Chun's supervisor was Dr. Schwartz, Clinical Director of the MGH Medical Oncology Network.  Dr. Chun ultimately reported to Dr. Ryan, MGH Chief of Hematology/Oncology and Clinical Director of the MGH Cancer Center.

43.     As Medical Director of the MGH/SNHMC Hematology/Oncology Practice, Dr. Chun was a member of the following MGH committees: MGH Cancer Center Leadership, MGH Cancer Center Directors, and MGH Clinical Directors.  Dr. Chun was also required to participate as a member of any SNHMC leadership committees identified by SNHMC.

44.     All of Dr. Chun's work for the Defendants, with the exception of an occasional meeting, was performed in Nashua, New Hampshire.

45.     Dr. Chun was paid by MGPO for the work she performed at FMP.

46.     MGPO provides the physicians that work at MGH, Mass General Brigham, and the Clinic at SolutionHealth Cancer Institute, among other institutions.

47.     Throughout her employment with Defendants, Dr. Chun experienced discrimination and was subjected to a hostile environment because of her sex and race.

48.     Defendants reacted negatively when Dr. Chun assertively raised issues about patient safety.

49.     Defendants did not tolerate assertive behavior from Dr. Chun because she is an Asian woman.

**CONCERNS ABOUT PATIENT SAFETY AND DISCRIMINATORY RETALIATION**

50.     During her employment, Dr. Chun repeatedly raised patient safety concerns to Defendants.

51.     Dr. Chun raised her concerns through the appropriate channels.

52.     But rather than responding to her concerns, Defendants retaliated against her for raising them.

53.     Dr. Chun first reported safety concerns within six months of starting her employment.  By way of example, Dr. Chun raised safety concerns including, but not limited to, the following:

        a.     Providers being allowed to enter therapy orders into two different electronic medical records systems.  The use of two different electronic medical records systems to enter treatment orders within one clinic would not be considered standard practice and could result in medical errors.  More specifically, the Clinic permitted providers to free text therapy order entries in Centricity, a system not designed for therapy orders, rather than entering them into the correct system, Intellidose.  The decision (without input from an oncologist) to change the Clinic's electronic medical record for patient therapy orders twice within six months was unsafe because each change required manual creation of order templates, manual review of hundreds of prior patient treatments, and manual entry of historical patient treatment data.  All of the steps along this process carried the risk of human error inherently associated with manual data entry.  In this process, physicians lost access to patients' historical chemotherapy records

(which had previously been available in Intellidose), which was important patient information for patient care;

   b. Pharmacy and nursing acting outside their scope of practice by accepting and administering therapy orders that were incomplete, without seeking further provider clarification (for example, by assuming infusion rates for hydration and electrolyte therapy);

   c. Incorrect and unsafe verbal order process whereby nurses and medical assistants received verbal orders from providers and then communicated the verbal order to another nurse or pharmacist to provide treatment;

   d. A nurse navigator/nurse manager acting outside the scope of her practice;

   e. Confusing clinic notes by Dr. Gautami Rao that were inaccurate, difficult to follow and, more often than not, copied and pasted from previous dates; and

   f. Nursing and pharmacy acting outside their scope of practice by administering cancer therapy despite patients not fulfilling pre-treatment criteria as dictated in the orders.

  54. As Medical Director, Dr. Chun continuously advocated for patient safety and tried to implement practices that were in line with standards found across medicine and oncology practice.  Many of the concerns Dr. Chun raised would be considered violations of accreditation boards (The Joint Commission and/or DNV), and/or regulatory boards, societies, and/or the Medicare and Medicaid payment system and, therefore, it was Dr. Chun's responsibility as Medical Director to address and remedy these issues as soon as possible, since they posed immediate harm to patient safety.

  55. For example, in 2018 or 2019, Dr. Chun raised quality issues with Dr. Rao's practice to Dr. Schwartz, MGH Cancer Center Network Director.  Dr. Schwartz offered his

assistance in helping her to speak with Dr. Rao about these issues.  Dr. Chun held a meeting that

included Dr. Schwartz and Ms. Hamson to review these concerns with Dr. Rao.

56.     In May and June 2020, Dr. Chun sent three separate emails highlighting serious

patient safety concerns that the Clinic needed to address, but the concerns contained in these

emails, which Dr. Chun often raised in meetings as well, were largely ignored by FMP.

57.     Given FMP and the Clinic's lack of follow through on Dr. Chun's safety

concerns, she sought advice from the physician leaders of FMP and MGH (Dr. DeLeo and Dr.

Schwartz), stated that she had various safety and operational concerns, and asked for further

assistance to improve the quality and safety of the Clinic.  Dr. DeLeo and Dr. Schwartz advised

Dr. Chun to have the Clinic submit occurrence reports to the Quality Department.

58.     Dr. Chun followed their advice, but there were still no improvements in the safety

and quality of the Clinic.

59.     Defendants then retaliated against Dr. Chun for raising these safety issues by

complaining about her "leadership style."  Dr. Schwartz informed Dr. Chun that FMP and the

Clinic did not like her "style."

60.     When Dr. Chun asked Dr. Schwartz for specifics examples about FMP and the

Clinic's concerns about her leadership style, no answers were forthcoming.

61.     However, Dr. Chun had previously received positive feedback about her

leadership style from Dr. Ryan, FMP, and SNHHS.

62.     Additionally, in an email to leaders of the MGH Cancer Center dated April 2,

2021, Dr. Chun highlighted all her accomplishments as the medical leader of the Clinic.

63.     The recipients of the email all agreed with the statements about Dr. Chun's

accomplishments as a leader.

64.     As a result of raising safety concerns, Dr. Chun was repeatedly retaliated against and subjected to a pattern of intimidation, clearly intended to force her to resign.

65.     In early 2021, a group of nurses who worked in the Clinic asked to meet with Dr. Chun to review some of their safety concerns.

66.     In this meeting, the nurses provided Dr. Chun with a written document of their concerns.

67.     As the Medical Director and an Oncologist, Dr. Chun felt that all the nurses' safety concerns were valid and legitimate and, therefore, she advocated for the nursing staff, Clinic, and patients by discussing and sharing the document with the Executive Director of SolutionHealth Cancer Institute, Ms. Clements.

68.     Despite Dr. Chun discussing and sharing the document with Ms. Clements, Defendants did not adequately respond to these safety concerns and did not resolve the issues.

69.     Defendants retaliated against Dr. Chun for raising these issues.

70.     In September 2021, this retaliation culminated with Defendants' leaders, including Dr. DeLeo and Ms. Cooper-Piela, contacting Dr. Chun's supervisor, Dr. Schwartz, and alleging quality issues with her work as a Physician.

71.     As a result of the retaliation by Dr. DeLeo and Ms. Cooper-Piela, Dr. Schwartz put Dr. Chun on an administrative leave and had 20 of Dr. Chun's patient charts reviewed by other MGH Oncologists.

72.     Following the review, Dr. Schwartz informed Dr. Chun that four of the 20 charts (20%) did not meet the standard of care and, as a result, MGH was placing her on administrative leave.

73.    Dr. Schwartz's statement that four of the charts (20%) did not meet the standard of care was not true.

74.    Dr. Schwartz also told Dr. Chun that she was the only Physician in the practice with quality issues.

75.    Dr. Schwartz's statement that Dr. Chun was the only Physician in the practice with quality issues was not true because Dr. Chun had raised issues about the quality of Dr. Rao's practice with Dr. Schwartz in 2018 or 2019.

76.    And, despite the fact that Dr. Chun had raised issues about the quality of Dr. Rao's practice with Dr. Schwartz in 2018 or 2019, upon information and belief, no investigation was ever done, and no remedial action was ever taken to address Dr. Rao's quality issues.

77.    Thereafter, Dr. Chun personally contacted the two physicians who had reviewed the four cases that allegedly did not meet the standard of care.

78.    Both physicians informed Dr. Chun that they had never told Dr. Schwartz that her care was substandard.

79.    Later, Dr. Ryan, reluctantly admitted to Dr. Chun that "yes, there are no quality issues."

80.    However, neither Dr. Schwartz nor Dr. DeLeo nor Ms. Cooper-Piele, ever spoke or wrote to Dr. Chun to acknowledge that there were no quality issues with her work, as one would expect following such an investigation by the Quality Department of FMP and by MGH Cancer Center.

81.    Moreover, in a meeting with Dr. Schwartz, Dr. Ryan, and Ms. Souza  to discuss the issue, all three insisted/recommended that Dr. Chun leave FMP without providing her any legitimate reason to do so.

82.     It is Dr. Chun's belief that Defendants intentionally orchestrated this event to intimidate and humiliate her into resigning in retaliation for raising safety concerns.

83.     Upon Dr. Chun's return, Dr. Cherif Abdelmalek, one of Dr. Chun's peers at FMH,  said to her, "I am surprised you came back.  I give you credit."

84.     Upon Dr. Chun's return from the leave, Dr. Abdelmalek and Dr. Rao avoided speaking with her and their behavior towards her was often very aggressive.

85.     In addition, upon Dr. Chun's return from the leave, Ms. Clements acted negatively towards Dr. Chun and did not speak to her for approximately two weeks after her return from leave.

86.     In addition, upon Dr. Chun's return from the leave, Dr. DeLeo acted negatively towards Dr. Chun and did not speak with her the first time he saw her after her return from leave.

87.     Dr. Chun spoke with her Medical Assistant shortly after Dr. Chun's return and the Medical Assistant told Dr. Chun that Dr. Abdelmalek and the Nurse Practitioner at FMP, Bryn Farrington, were furious that she had returned to work at FMP.

88.     It was around this time that Dr. Chun first learned that Drs. Rao and Abdelmalek had spoken with Defendants and complained about the way Dr. Chun handled certain patient-related matters within the hospital and Clinic.

89.     Dr. Chun believes that she practices medicine in a manner like other male Oncologists who had practiced in the Clinic, namely Drs. Roger Hakimian and Jerry Diener, but Dr. Rao, who worked with both male Physicians, never complained about their style of practicing medicine.

90.     The Clinic was also regularly covered by a group of Oncologists from St. Joseph's Hospital and occasionally by Oncologists from MGH.

14

91.     Dr. Chun believes that she covered their practice in a similar manner to these "outside" Physicians, and neither Dr. Abdelmalek nor Dr. Rao raised concerns about them.

92.     Dr. Chun believes Drs. Rao and Abdelmalek alleged substandard care and targeted her because she is a confident, assertive, Asian woman, and they did not like this.

93.     Defendants subjected Dr. Chun to unwarranted scrutiny because she is an Asian woman.

94.     Defendants' claims, initially of poor leadership style and then subsequent claims of substandard care, were baseless.

95.     Defendants' claims were based on prejudice against Dr. Chun for being an assertive Asian woman.

96.     Dr. Chun's placement on administrative leave by Defendants was intentionally orchestrated by Defendants to try to force her to resign.

97.      Shortly following Dr. Chun's return from the administrative leave and being subjected to certain behaviors in the Clinic, on September 27, 2021, Dr. Chun sent an email to Defendants about her concern that she was being subjected to certain behaviors, stating: "because I'm female, Asian, I don't live up to his [Dr. Abelmalek's] biases."

98.     This was an internal complaint of discrimination.

99.     Additionally, Dr. Chun referenced safety and quality concerns about Dr. Rao's and Dr. Abdelmalek's practice and then wrote: "These are all quality issues that I have had to address as Medical Director and ,therefore, I can't seem to think that this is some form of retaliation."

100.    Despite Dr. Chun's internal complaint of discrimination to Defendants on September 27, 2021, Defendants did not investigate, respond to or take remedial action despite Dr. Chun's internal complaint of discrimination.

101.    Despite Dr. Chun's internal complaint of retaliation for raising safety concerns to Defendants on September 27, 2021, Defendants did not investigate, respond to, or take remedial action, despite Dr. Chun's internal complaint of retaliation.

102.    Defendants' failure to investigate, respond to or take remedial action despite Dr. Chun's internal complaint of discrimination and retaliation allowed Dr. Rao, Dr. Abdelmalek, Dr. DeLeo, and Marsha Clements, amongst others, to continue to discriminate and retaliate against Dr. Chun because she is an Asian woman and she had raised safety concerns.

103.    Despite findings of no wrongdoing, Dr. Chun was so traumatized and humiliated by her treatment and the administrative leave, along with other unlawful conduct to which she was subjected, that she was forced to resign as Medical Director of the Clinic on October 11, 2021.

104.    The following are examples of the discriminatory, harassing, and retaliatory behavior to which Dr. Chun was subjected:

a.    Despite finding no quality issues in Dr. Chun's practice, Dr. Rao continued to try to insist there were.  In a meeting that occurred (within several weeks of Dr. Chun's return from the retaliatory administrative leave), Dr. Rao complained about Dr. Chun regarding a patient care issue, insinuating poor patient care on Dr. Chun's part.

b.    Defendants engaged Timothy Sullivan of Wellesley Partners to work with the Clinic.  Mr. Sullivan was present for a couple of meetings and witnessed the interactions of the group, which often included: Dr. Chun, Dr. Rao, Dr. Abdelmalek, and Ms. Clements.

16

Following Mr. Sullivan's participation and observation in the meetings, he shared with Dr. Chun that he believed Dr. Abdelmalek was sexist and wanted to be the dominant male in the group. In the meetings, Dr. Abdelmalek stated there were "red lines" that he would not allow Dr. Chun and others to cross. When Mr. Sullivan and his partner, Mr. Steve Levinsky, inquired about the "red lines" and the basis for his "red lines," Dr. Abdelmalek admitted that these "red lines" were his arbitrary rules, and did not come from any industry or MGH standard that he could point to, but were valid because "they are my red lines" and they were not up for discussion.

       c.      In a subsequent private conversation with Mr. Sullivan, Mr. Sullivan expressed to Dr. Chun that he believed Dr. Abdelmalek expected her and other women to conform to Dr. Abdelmalek's sexist and arbitrary expectations. Mr. Sullivan shared that Dr. Rao was not assertive and that he saw her as a follower of Dr. Abdelmalek's aggressive personality. It is Dr. Chun's belief that Mr. Sullivan shared these observations with leaders of Defendants. The repeated lack of any response by Defendants permitted this hostile behavior and sexist attitude to continue in the Clinic.

       d.      For example, one day, Ms. Clements and Dr. Rao suddenly pulled Dr. Chun into a meeting and accused her of delivering improper care to a patient. They told Dr. Chun that Dr. Abdelmalek had complained to them, was "hot under the collar," and upset that Dr. Chun had not documented something in the patient's chart after a nurse's evaluation of her patient. During this meeting, neither Ms. Clements nor Dr. Rao brought forward any details of the case (such as chronology of events and other participants in the patient's care), or allowed Dr. Chun to review the chart independently. Instead, Ms. Clements and Dr. Rao condemned Dr. Chun on their own (and Dr. Abdelmalek's) accord and noted verbally and subsequently documented in writing their finding of Dr. Chun's wrongdoing.

e. Later, Dr. Chun independently reviewed the patient's chart, and nothing improper had occurred. In fact, the documentation that Dr. Chun was criticized for not doing was because the nurse had never forwarded her the chart or sent her a note asking her to comment in the chart and, therefore, there was no way Dr. Chun could have known about the issue. Dr. Chun summarized her independent findings in an email to Ms. Clements and Dr. Rao, but neither one responded to her email to acknowledge that there was no wrongdoing on her part.

f. It is Dr. Chun's belief that no other provider or staff member who was employed by Defendants to work in the Clinic was "written up" and subjected to the same process (condemnation without a fair investigation because one doctor was upset with another), like Dr. Chun was. Dr. Chun was "written up" because she is an Asian female. Dr. Chun believes Ms. Clements and Dr. Rao felt that their actions were acceptable because Dr. Abdelmalek is superior to her because she is an Asian female and Ms. Clements and Dr. Rao needed to abide by Dr. Abdelmalek's racist and sexist expectations. Furthermore, Ms. Clements and Dr. Rao did not conduct an unbiased investigatory process, which would have been afforded to any other physician who is not an Asian woman.

105. Even after experiencing this retaliation, Dr. Chun continued to advocate for patient safety and report her safety concerns.

106. In May 2022, Dr. Chun again reported safety concerns of which she became aware while covering Dr. Rao's practice. While covering Dr. Rao's practice previously, Dr. Chun had reviewed a patient's chart and realized that the patient had incorrectly received a combination of intravenous and oral cancer therapy, despite persistently low blood counts. The patient's treatment had not been held or adjusted, and not clarified per standard practice. This patient suffered long-term pulmonary consequences because of this iatrogenic (illness the

medical practice caused) incident, and probably suffered a negative impact to his survival because his performance status declined after this infection, and he was no longer eligible for certain cancer therapy due to this decline.

107.    After discovering this error, Dr. Chun discussed her findings with Clinic leaders along with recommendations for improvement.

108.    However, in May 2022, Dr. Chun discovered similar incidents were occurring again whereby nursing and the pharmacy were not reviewing/clarifying therapy orders independently per oncology standard of care, with respect to Dr. Rao's patients.  As a result, patients received treatment contrary to the written provider orders in the medical records.  For example, treatment was administered without question or clarification, despite written orders specifying requirements prior to treatment that had not been completed.  Examples of these requirements were pre-treatment lab work and echocardiograms.

109.    Dr. Chun raised these concerns to Ms. Clements, Jaclyn Leland, a SNHHS Pharmacist, Amanda Tardiff, SNHMC Nurse Manager, Kathy Hamson, Practice Manager of the Clinic, and Dr. Rao.  Only Ms. Leland responded saying that she agreed that there was an issue. Since there was minimal response to Dr. Chun's above email from the group, she felt ethically and morally bound to speak up and raised the issue at the next Provider meeting on June 7, 2022. During the meeting, Dr. Chun was ignored and dismissed, and the group refused to address her concerns and/or come up with a remedy to address this serious safety issue.

110.    In June 2022, Dr. Chun again raised an issue that the Nurse Navigator, Anne Goudreau, was practicing outside the scope of her medical license.  Prior to June 2022, in Dr. Chun's role as the Medical Director and practicing physician, it was not unusual for Clinic staff to approach Dr. Chun with their concerns. One of these concerns was that Ms. Goudreau was

working outside her scope of practice.  For example, the Charge Nurse told Dr. Chun that Ms. Goudreau admitted to working outside her scope of practice and encouraged other nurses working under her to do the same.  In addition, Ms. Goudreau reportedly said to the Charge Nurse and other Nurses, "You know that we are not supposed to function like nurse practitioners, but you know we do it anyway.  It's OK."  The Charge Nurse stated that she was offended by the statement, since she had never worked outside her scope of practice.

111.   By way of another example, the Nurse Practitioner in the Clinic, Ms. Farrington, also approached Dr. Chun on several occasions with a similar concern about Ms. Goudreau working outside her scope of practice.  Ms. Farrington told Dr. Chun that Ms. Goudreau would diagnose and provide recommendations to patients over the phone, and after the call with patients, would then ask Ms. Farrington to prescribe the medications that Ms. Goudreau had already recommended to the patient.

112.   Dr. Chun encouraged both the Charge Nurse and Nurse Practitioner to report their concerns to Clinic management and they told her they had.

113.   At one point, Dr. Chun directly witnessed Ms. Goudreau acting outside her scope of practice.

114.   It was also commonplace for Ms. Goudreau to place orders in the electronic medical record for labs she felt were warranted, without a provider order, and tell the provider later about it.  Dr. Chun shared these issues, along with other safety concerns related to nursing, with FMP leaders, including Ms. Hamson, Ms. Clements, and Dr. DeLeo, and encouraged all to respond to these allegations and advised coaching for Ms. Goudreau.

115.    During a meeting with Ms. Clements to discuss the issue regarding Ms. Goudreau, Dr. Chun was ignored and dismissed.  Ms. Goudreau was allowed to continue to work outside her scope of practice.

116.    Later in June 2022, when Dr. Chun again witnessed Ms. Goudreau working outside her scope of practice, Dr. Chun reported this issue to Ms. Clements and Ms. Hamson. Ms. Clements and Ms. Hamson did not respond to Dr. Chun's concern.  Dr. Chun then reported the issue to the Departments of Quality and Risk Management and provided specific patient names and charts with which she was concerned.

117.    After Dr. Chun's report to Quality and Risk Management, Ms. Clements and Dr. Rao met with her and informed her that Quality had not found any issues related to Ms. Goudreau and that in the future, Dr. Chun needed to raise issues with them and not report them to the Quality Department.  They also told Dr. Chun that she should not talk to staff about other staff.

118.    Immediately following the above-mentioned meeting with Ms. Clements and Dr. Rao, on July 23, 2022, Dr. Chun sent an email to Dr. DeLeo, Ms. Cooper-Piele, and Kathy Levesque (members of the FMP Quality and Risk Departments) stating that she disagreed with Quality's finding that there was no issue with Ms. Goudreau, asked them whether they reviewed the charts with which she had raised concerns, and requested an in-person meeting to discuss the matter.  Dr. Chun never received a response.

119.    Dr. Chun also sent a separate email to her supervisors at the MGH Cancer Center, Dr. Schwartz and Dr. Ryan, to ask for assistance in the matter.

120.    Despite Dr. Chun's request for assistance from FMP and MGH, there was no assistance provided to her but, rather, Defendants continued to retaliate against her.

121.    On July 29, 2022, Dr. Chun received a sudden call from Dr. Ryan (Chief Hematology/Oncology of MGH, and Clinical Director of MGH Cancer Center) and Ms. Souza (Director, MGH Cancer Center) notifying her that she was being placed on a second administrative leave for "disruptive behavior."

122.    Dr. Chun asked for details, but she was never provided with any answers.

123.    In fact, in a subsequent call with Mara Bloom (Vice President of MGH Cancer Center), Dr. Chun was reassured by Ms. Bloom that there were no concerns about her behavior or performance as a Physician, and Ms. Bloom offered her multiple job opportunities within the MGH network.

124.    Ms. Bloom also told Dr. Chun that there were leadership positions potentially available to her in the future at the MGH Danvers site.

125.    FMP and MGH falsely characterized Dr. Chun's act of raising safety concerns as an Asian female physician as "disruptive" behavior and took action against her for it.

126.    Even after Defendants placed Dr. Chun on an unwarranted second administrative leave in July 2022, the retaliation continued.

127.    For example, on August 25, 2022, Ms. Bloom relayed a shocking message to Dr. Chun from Dr. DeLeo.

128.    Ms. Bloom told Dr. Chun that if she did not voluntarily resign from FMP, then Dr. DeLeo would report her to the NH Board of Medicine.

129.    Dr. Chun does not believe there is or was any legitimate reason for Dr. DeLeo to report her to the Board of Medicine, and believes that Dr. DeLeo's message to Dr. Chun, relayed by Ms. Bloom, was, in actuality, a threat.

130.    Dr. DeLeo's threat to report Dr. Chun to the Board of Medicine if she did not voluntarily resign from FMP was further retaliation against her for her internal complaint of

discrimination and for her reports of multiple patient safety concerns to Defendants as described throughout this Complaint.

131.    Indeed, Dr. DeLeo likely presumed that to threaten to report Dr. Chun to the Board of Medicine would scare Dr. Chun enough to finally cause her to resign from her employment.

132.    Dr. Chun believes that MGH was complicit in the retaliatory acts by FMP, and knew of FMP's retaliation toward Dr. Chun, including, but not limited to, Dr. DeLeo's threat to report Dr. Chun to the NH Board of Medicine if she did not voluntarily resign from FMP.

133.    Over the course of her employment, it became clear to Dr. Chun that FMP and MGH had no intention of allowing her to return to work at FMP, despite her having spent years building a clinical practice.

134.    Defendants' retaliatory actions took away Dr. Chun's job and career opportunities, and caused her emotional distress.

135.    Defendants retaliated against Dr. Chun for making an internal complaint of sex and race discrimination, and retaliated against her for reporting multiple patient-safety concerns as described herein.

136.    In addition, throughout Dr. Chun's employment with Defendants, she was discriminated against based on her sex and race.

137.    Moreover, throughout Dr. Chun's employment with Defendants, she was subjected to a hostile environment based on her sex and race.

138.    After Defendants placed Dr. Chun on the second administrative leave, Ms. Bloom sent her an email in which she offered Dr. Chun positions at MGH sites other than FMP.

139.     Dr. Chun could not entertain any of the positions because of the retaliation and intimidation she experienced by Defendants, after being discriminated against based on sex and race, subjected to a hostile environment based on her sex and race, retaliated against for making an internal complaint of race and sex discrimination, and retaliated against for raising patient safety issues at FMP.

140.     Dr. Chun was intimidated by the false allegations associated with her two administrative leaves, claims which were made by FMP and MGH.

141.     The false allegation that resulted in Dr. Chun's first administrative leave was that she provided substandard care to patients.

142.     The false allegation that resulted in Dr. Chun's second administrative leave was that she had engaged in "disruptive" behavior.

143.     Dr. Chun reasonably feared that these false allegations would spread around the tight-knit oncology community in New England and taint her professional reputation with colleagues and patients for the rest of her medical career.

144.     As a result, she had no alternative but to resign from her employment with Defendants on October 7, 2022, as described below.

**DEFENDANTS TOLERATED ASSERTIVE BEHAVIOR FROM OTHERS**

145.     Dr. Chun assertively raised the aforementioned safety concerns, but the Defendants did not tolerate her assertive nature.

146.     However, Defendants routinely tolerated assertive behavior from physicians who were not Asian women.  For example:

         a.     Dr. Chun's colleague Dr. Abdelmalek, acted assertively at work throughout Dr. Chun's employment with Defendants and was rarely spoken to about it, never

disciplined, never placed on leave, and never had any other negative consequence for his assertiveness.

       b.     Dr. Chun was treated less favorably than her male peer, Dr. Abdelmalek, in other ways as well.  For example, when Dr. Chun had to be out of the office due to illness, FMP called MGH to report her absences, despite the fact that she had the right to be out of work when she was sick.[1]  Over time, this made Dr. Chun fearful of taking any time off from work, even when she was sick.

       c.     In fact, at one point, after Dr. Chun had been out of the office for a day or two with an illness, the Office Manager, Ms. Hamson, told her that she and staff thought that Dr. Chun should come into the office when she was sick, and just wear a mask.  To make up for not seeing patients on days when she was home sick, Dr. Chun frequently saw patients at the office on her administrative days or her days off.

       d.     In contrast, Dr. Abdelmalek was absent many times from work. Sometimes, he even left in the middle of a Clinic day because either he did not feel well, a family member was sick, or, on occasion, he was "just tired."  Upon information and belief, FMP never reported any of Dr. Abdelmalek's absences to MGH, in the way it did with Dr. Chun's absences.

       e.     Defendants claimed that Dr. Chun was "disruptive" at work, which she believes was because Defendants would not tolerate assertive behavior from an Asian woman like her.  In contrast, Dr. Abdelmalek could act in whatever way he wanted, without recourse.

---

[1] Upon information and belief, FMP did not provide MGH with documentation regarding any dates that Dr. Chun had been out of work because she was sick.  Likewise, MGH/Dr. Schwartz did not provide any data to back up FMPs allegations when Dr. Chun asked Dr. Schwartz about it.

f.     By way of example, on July 6, 2022, Dr. Abdelmalek was mad about one of their workflows at work.  He sent a message to multiple people in the Clinic stating that he was "not going to do it anymore."  He then had a tantrum in the office during which he yelled, "They can fire me!"  Dr. Abdelmalek's tantrum was witnessed by multiple staff members who told Dr. Chun about it the next day.  Despite this tantrum, upon information and belief, there were never any consequences for Dr. Abdelmalek's behavior at work, and Dr. Chun never heard anyone refer to him as being "disruptive." Moreover, he was allowed to discontinue the workflow that he assertively opposed in his message above.

g.     On July 12, 2022, Dr. Abdelmalek was allowed to engage in inappropriate behavior with impunity.  During a provider meeting, he forcefully stated to Ms. Clements, "You need to get it through your mind that we are not like the practice in Manchester."  His statement came out like "You need to get it through your thick skull…"  Upon information and belief, Dr. Abdelmalek was not disciplined for his public behavior and/or about his statement to Ms. Clements, while Dr. Chun was accused of being "disruptive."  This meeting was attended by Ms. Hamson, Ms. Leland, Bryn Farrington ARNP, and Dr. Rao.

h.     During the same meeting as described in the prior paragraph, Dr. Abdelmalek advocated for each doctor to have a nurse who would be his/her point of contact. Despite the disruptive behavior exemplified by Dr. Abdelmalek in the meeting noted above, immediately after the meeting, Ms. Clements met with the nurses and made Dr. Abdelmalek's requested change.

i.     In contrast, previously, over the course of months, Dr. Chun had made that same request as Dr. Abdelmalek, and her request had completely been ignored.  In fact, Dr.

Chun's request was vehemently denied by Ms. Clements and Ms. Hamson over many months, in contrast to Dr. Abdelmalek's identical request which was granted promptly.

j.      Dr. Abdelmalek sent numerous emails to the Defendants that contained an aggressive tone. In these emails, he expressed his extreme displeasure and unhappiness regarding various areas of SNHHS such as blood transfusions and radiology.  Dr. Chun does not believe Dr. Abdelmalek was ever disciplined for this behavior.

k.      Another male doctor named Dr. Jerry Diener, who was employed by Defendants, was also allowed to behave in a "disruptive" way with impunity.

l.      Dr. Diener worked for Defendants for over a year prior to Dr. Abdelmalek's employment.

m.      Dr. Diener at times had difficult relationships with the Nurse Manager, the Office Manager, and some of the nurses.

n.      Upon information and belief, at some point, Dr. Diener was spoken to by Mark Santos, Chief Operating Officer of Foundation Medical Partners, and Sue Diehl, Associate VP of Operations for Foundation Medical Partners, regarding some of his behavioral issues. However, Dr. Diener was never placed on any administrative leave during his employment and/or terminated.  To the contrary, he was asked to renew his assignment with Defendants multiple times.

o.      Dr. Diener even wrote inappropriate comments in patients' charts such as words to the effect "…did the doctor go to medical school?"  This information was known to Defendants because the front office staff wrote examples of his behavior in a notebook, known as "The Bible" that they kept to document his behavior, yet, Dr. Diener was not disciplined, not put on leave, his employment was not threatened, and he was not terminated.

p.      At one point, Dr. Chun was in attendance at a meeting which included Dr. Ken Tanabe, MGH Chief of Surgery.  During this meeting, Dr. Tanabe reported Dr. Diener's off-putting interactions with Dr. Tanabe and breast surgeons from MGH (Dr. Oseni and Dr. Gadd).  Both Dr. DeLeo and Mark Santos were present in this meeting, yet nothing negative happened to Dr. Diener.  Dr. Schwartz was aware of these complaints concerning Dr. Diener's interactions with their MGH colleagues, because Dr. Schwartz raised it with Dr. Chun on a few occasions.

147.    In short, male Physicians were repeatedly permitted to act in inappropriate ways by Defendants with impunity.  Male Physicians who were actually acting "disruptive" at work were allowed to continue their behavior without discipline, without being placed on administrative leaves, without being labeled as "disruptive," without being threatened with a report to the NH Board of Medicine, without compromising their positions, and without losing their jobs.

148.    In contrast, Defendants expected Dr. Chun to conform with the stereotype that Asian women are subservient and quiet.

149.    Those terms (subservient and quiet) are not adjectives Dr. Chun would use to describe herself.  Rather, she is a strong, confident, vocal, assertive, resilient, and determined individual.

150.    When Dr. Chun assertively advocated for patient safety, rather than conforming to Defendants' sexist and racist stereotypes, Defendants labeled her as "disruptive" and engaged in a campaign of retaliation against her, culminating in a threat to report her to the New Hampshire Board of Medicine, as described above.

151.    When Dr. Chun raised her concerns to Defendants that she was being discriminated against on the basis of race and sex, her concerns were dismissed; no investigation, no findings, and no remedial action.

152.    The discrimination, hostile environment, and retaliation were permitted to continue throughout the remainder of Dr. Chun's employment with Defendants.

153.    Defendants also tolerated assertive behavior from non-Asian women such as Ms. Clements, the Executive Director of the SolutionHealth Cancer Institute.  Dr. Chun heard Ms. Clements make comments to Dr. Chun and others that characterized Ms. Clements' own assertiveness including: "I always get what I want," "I love spending other people's money," and "I'm not used to people saying no to me."  While it was acceptable for Ms. Clements to behave and display assertive qualities, Ms. Clements and Defendants did not tolerate Dr. Chun's confidence and assertive qualities as a leader or individual because she is an Asian woman.

## DEFENDANTS TREATED NON-ASSERTIVE
## ASIAN FEMALE PHYSICIANS MORE FAVORABLY

154.    Dr. Rao was treated more favorably than Dr. Chun because she conformed to Defendants' racist and sexist stereotype that Asian women are not assertive.

155.    Dr. Rao worked long hours and saw an enormous number of patients, which Defendants admired, even if it meant that it resulted in patient safety issues and/or treatment errors and/or incorrect notes being placed in Defendants' patients' medical records.

156.    For example, there was an incident regarding one of Dr. Rao's patients related to the administration of intra-thecal chemotherapy (drug administered into the cerebrospinal fluid). The incident was concerning enough that it prompted a system-wide meeting which included Quality, Operations, Pharmacy, and Nursing.

157.    However, Dr. Chun found it extremely unusual that Defendants did not ask Dr. Rao to be present, despite the incident involving Dr. Rao's patient and Dr. Rao being the only Physician in their health system who administered intra-thecal chemotherapy and who was, therefore, the only Physician who could comment on the process.

158.    Dr. Rao was never disciplined for these safety issues, despite Defendants knowing that this was happening.

159.    Dr. Chun never committed these safety errors like Dr. Rao, but Dr. Chun was the one who was accused of substandard care and then placed on her first administrative leave as described above.

160.    Dr. Chun believes Defendants received safety reports, either officially or unofficially, about Dr. Rao's practice, but Defendants never addressed them appropriately.

161.    For example, in mid-2021, through the 21st Century Cures Act, patients in their Clinic suddenly had increased access to their medical records.

162.    Following patients being able to access their medical records, a number of Dr. Rao's patients called to complain that their medical notes were inaccurate, and some patients even left the practice, citing lack of confidence in the care they received due to the inaccuracy of Dr. Rao's notes.

163.    Defendants were aware of the patients' complaints regarding Dr. Rao's care, their departure from the Clinic, and the long-standing issue of inaccurate notes by Dr. Rao, but over the years, Defendants continued to allow this to occur, and, upon information and belief, Dr. Rao was never disciplined, never accused of substandard care, never placed on administrative leave, never threatened with being reported to the NH Board of Medicine, and never asked to resign from her employment with Defendants.

164.     There was a culture in the Clinic whereby Dr. Rao's unsafe practices were accepted because she conformed to the racist and sexist stereotypes of submissive and compliant Asian women.

165.     Dr. Rao exemplified her own sexism in her statement to Dr. Chun after she became Medical Director, stating she was more suited to be Medical Director over Dr. Chun, not based on merit or qualifications, but "because you're still raising your children and my daughter is all grown."  Dr. Chun does not believe Dr. Rao would have made this comment to a male Physician.

## REPORTS OF SEX AND RACE DISCRIMINATION

166.     As described herein, Dr. Chun made internal complaints of sex and race discrimination to Defendants on multiple occasions.

167.     Despite Dr. Chun's internal complaints of sex and race discrimination, Defendants did not investigate, did not reach any findings, and did not take any remedial actions in response to Dr. Chun's complaints.

168.     Within weeks of Dr. Chun being hired as the Medical Director of the Clinic and, thereafter, the Office Manager of the Clinic, Kathy Hamson, made sexist statements during their conversations such as, "I was hoping we would hire a male Director (instead of you)," and "It's not good when there are too many women working together," and "There's too much drama when too many women work together."

169.     These sexist statements made Dr. Chun uncomfortable but, initially, she was too new and intimidated by her "newness" to speak up.

170.     However, at some point, Dr. Chun finally had the courage to speak up to Ms. Hamson and others who made these comments.

171.    For example, at one point, one of the male physicians resigned and they started looking to hire a new physician.

172.    Dr. Chun heard from Ms. Hamson and others in the Clinic on numerous occasions, "I hope we hire a male physician."

173.    This statement was made in front of higher-level leadership, and Ms. Hamson's supervisor, Sue Diehl, Associate VP of Operations of FMP, on a couple of occasions.

174.    In addition, this same statement was made during meetings.

175.    Dr. Chun finally spoke up and whenever she heard the statement ("I hope we hire a male physician"), she told the speaker that the statement was illegal.

176.    Ms. Hamson and Ms. Diehl responded by saying that "We prefer to hire a male physician because some male patients won't come to our clinic unless they see a male physician," instead of taking appropriate action.

177.    After this, Dr. Chun no longer spoke up about such comments because she feared retaliation, since these statements were being made by management-level employees of the Clinic (leaders) in front of other management-level employees of the Clinic (leaders).

178.    As noted previously, on September 27, 2021, Dr. Chun sent an email to Dr. Ryan, Dr. Schwartz, and Ms. Souza, copying Dr. DeLeo, in which she asked whether certain actions were because "I'm female, Asian, I don't live up to [Dr. Abdelmalek's] biases about physicians?"

179.    The only acknowledgement Dr. Chun ever received was an email response by Ms. Souza, which stated, "We will not tolerate discrimination."

180.     The statement by Ms. Souza ("We will not tolerate discrimination") made clear that Ms. Souza understood Dr. Chun's statement to be an internal complaint of sex and race discrimination.

181.     Yet, upon information and belief, the Defendants did not investigate, reach findings, or take any remedial action to see to it that Dr. Chun stopped being discriminated against on the basis of her race or sex by Defendants.

182.     On August 8, 2022, Dr. Chun wrote to Ellen Nelson in MGH's HR Department.

183.     Since Dr. Chun believed that placing a physician on immediate administrative leave only occurred in rare circumstances and for egregious acts, she told Ms. Nelson that her placement on leave in July 2022, had been in retaliation for raising safety concerns, and that it was because she is "Chinese and female."

184.     Dr. Chun never received a response.

185.     Dr. Chun's August 8, 2022 communication to Ms. Nelson was an internal complaint of discrimination and an internal complaint that she was being retaliated against for raising patient-safety concerns.

186.     Yet, again, Defendants failed to investigate, failed to reach findings, and failed to take remedial action to see to it that the retaliation against her for raising patient safety concerns ceased.

187.     And, Defendants failed to take remedial action to see to it that Dr. Chun was not subjected to continued discrimination on the basis of her race and sex, and not retaliated against for her internal complaint of discrimination on the basis of her race and sex.

188.     Instead, Defendants' discrimination, hostile environment and retaliation toward Dr. Chun continued.

189.     As a result of Defendants' discrimination against Dr. Chun, failure to investigate her claims of discrimination, failure to take prompt remedial action to see to it that the discrimination toward Dr. Chun ceased, Defendants' tolerance of a hostile work environment toward Dr. Chun, retaliation against Dr. Chun for reporting race and sex discrimination, retaliation against Dr. Chun for repeatedly raising patient-safety concerns, and baseless threat to Dr. Chun's professional career by threatening to report her to the Board of Medicine, she had no choice but to resign from her employment with Defendants on October 7, 2022.

190.     The treatment to which Dr. Chun was subjected, as described throughout this Complaint, was so severe and intolerable that any reasonable person would have resigned from their employment. *Karch v. BayBank FSB*, 147 N.H. 525 (2002); *Porter v. City of Manchester*, 151 N.H. 30 (2004); *Lacasse v. Spaulding Youth Center*, 154 N.H. 246 (2006).

191.     As a result of Defendants' unlawful acts described herein, which led to Dr. Chun having no choice but to resign from her employment on October 7, 2022, Dr. Chun has suffered damages.

192.     Since the unlawful constructive discharge of her employment, Dr. Chun has been unable to secure alternative, comparable work and thus has incurred, and will continue to incur, lost wages and benefits.

193.     In addition, Defendants' unlawful acts as described herein, including, but not limited to, the constructive discharge of her employment, has caused, and continues to cause, Dr. Chun emotional harm.

194.     In addition, due to Defendants' unlawful acts as described herein, including, but not limited to, the constructive discharge of her employment, Dr. Chun has incurred, and will incur, attorneys' fees and costs.

## COUNT I
## SEX AND RACE DISCRIMINATION - TITLE VII - MGH, MGPO, SH, SNHMC, FMP

195.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

196.    As described herein, Plaintiff was subjected to discrimination on the basis of her sex and race by the Defendants throughout her employment.

197.    The Defendants willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by causing Plaintiff to be subjected to sex and race discrimination as described herein, and by constructively terminating Plaintiff on October 7, 2022.

198.    As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT II
## SEX AND RACE DISCRIMINATION - N.H. RSA 354-A
## MGH, MGPO, SH, SNHMC, FMP

199.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

200.    As described herein, Plaintiff was subjected to discrimination on the basis of her sex and race by the Defendants throughout her employment.

201.    The discrimination culminated in the constructive termination of her employment by the Defendants on October 7, 2022.

202.    All of the Defendants' unlawful employment practices as described herein violated N.H. RSA 354-A:7, I. As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form

of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

**COUNT III**
**RACE DISCRIMINATION - 42 U.S.C. §1981 - MGH, MGPO, SH, SNHMC, FMP**

203.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

204.    The Plaintiff is an Asian woman.

205.    The Defendants intentionally discriminated against the Plaintiff on the basis of her race in violation of 42 U.S.C. §1981.

206.    The Defendants' actions were in willful, gross and/or in reckless disregard of the Plaintiff's rights under 42 U.S.C. §1981.

207.    As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured by 42 USC §1981, as herein above stated, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, physical and emotional injury, pain and suffering, loss of enjoyment of life, punitive damages, and attorneys' fees and costs.

**COUNT IV**
**HOSTILE ENVIRONMENT- SEX - TITLE VII - MGH, MGPO, SH, SNHMC, FMP**

208.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

209.    As described throughout Plaintiff's Complaint, Plaintiff was subjected to repeated offensive comments regarding her sex and conduct based upon her sex.

210.    The repeated offensive comments and conduct were based on Plaintiff's sex.

211.    The repeated offensive comments and conduct regarding Plaintiff's sex were so severe and/or pervasive that they created an offensive and demeaning work environment for Plaintiff and interfered with her ability to perform her job.

212.    The Defendants had actual knowledge of the sex-based harassment because Plaintiff reported the sex discrimination to the Defendants, as described in this Complaint.

213.    Despite Plaintiff reporting the sex-based harassment to the Defendants, the Defendants failed to take appropriate remedial action that would have enabled Plaintiff to continue working without the threat of being subjected to a hostile and inappropriate work environment, as well as the potential for retaliation for reporting the sex-based harassment, which said retaliation did occur as described in the Complaint.

214.    Plaintiff did not welcome, encourage, or consent to the sex-based harassment to which she was subjected as an employee of the Defendants.

215.    The sex-based harassment to which Plaintiff was subjected as an employee of the Defendants has had, and continues to have, a detrimental effect upon her employment and personal well-being. The Defendants willfully violated Title VII, 42 U.S.C. §2000(e) *et seq.* by subjecting Plaintiff to sex-based harassment (hostile environment) during her employment with the Defendants as described in this Complaint. As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT V
## HOSTILE ENVIRONMENT – SEX - N.H. RSA 354-A - MGH, MGPO, SH, SNHMC, FMP

216.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

37

217.     The Defendants' unlawful employment practices in allowing Plaintiff to be subjected to sex-based harassment and in failing to take prompt remedial action to see to it that the sex-based harassment ended, violated New Hampshire RSA 354-A.

218.     As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

**COUNT VI**
**RETALIATION - SEX AND RACE - TITLE VII - MGH, MGPO, SH, SNHMC, FMP**

219.     Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

220.     On the heels of Plaintiff reporting sex and race discrimination, she was retaliated against by the Defendants, as described throughout this Complaint, including, but not limited to, being placed on two separate administrative leaves based on false allegations, and culminating in the constructive discharge of her employment on October 7, 2022.

221.     Defendants willfully violated Title VII, 42 U.S.C. §2000(e) *et seq*. by retaliating against Plaintiff for reporting sex and race discrimination as described in this Complaint.

222.     As a direct and proximate result of the Defendants' violation of the Plaintiff's rights secured under 42 U.S.C. §2000(e) *et seq.*, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT VII
## RETALIATION - SEX AND RACE - N.H. RSA 354-A - MGH, MGPO, SH, SNHMC, FMP

223.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

224.    On the heels of Plaintiff reporting sex and race discrimination, she was retaliated against by the Defendants, as described throughout this Complaint, including, but not limited to, being placed on two separate administrative leaves based on false allegations, and culminating in the constructive discharge of her employment on October 7, 2022.

225.    The Defendants' unlawful retaliation against Plaintiff for reporting sex and race discrimination violates N.H. RSA 354-A:7, I.

226.    As a direct and proximate result of the violation of the Plaintiff's rights secured under RSA 354-A, as stated herein, the Plaintiff has incurred damages in the form of lost wages and benefits, future lost wages and benefits, compensatory damages, enhanced compensatory damages, and attorneys' fees and costs.

## COUNT VIII
## COMMON LAW WRONGFUL CONSTRUCTIVE TERMINATION
## MGH, MGPO, SH, SNHMC, FMP

227.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

228.    Plaintiff was retaliated against by all Defendants, including, but not limited to, being forced to resign as medical director, placed on two administrative leaves, being threatened with a report to the N.H. Board of Medicine, and given no choice but to resign from her employment all in violation of public policy for taking actions that public policy would encourage, namely, for reporting concerns of unsafe and/or illegal practices which negatively impacted patient safety for the patients of all defendants and reporting sex and race

discrimination, as described throughout this Complaint. *Cloutier v. Great Atlantic & Pac. Tea Co., Inc.*, 121 N.H. 915 (1981).

229.    The Defendants' wrongful constructive termination of Plaintiff's employment was motivated by bad faith, retaliation, and malice. *Wenners v. Great State Beverages*, 140 N.H. 100, 103 (1995), *cert. denied*, 516 U.S. 1119 (1996).

230.    As a result of the wrongful constructive termination of her employment, Plaintiff has suffered, and continues to suffer, substantial injury and damage, including, but not limited to, back pay and benefits, front pay and benefits, and lost future earnings and benefits, physical pain and suffering, emotional distress, and enhanced compensatory damages for the wanton, oppressive, and malicious actions of Defendants, all within the jurisdictional limits of this Court.

## COUNT IX
## VIOLATION OF N.H. RSA 275-E - MGH, MGPO, SH, SNHMC, FMP

231.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

232.    The Defendants all harassed, abused, intimidated, and constructively terminated Plaintiff because she, in good faith, reported what she reasonably believed were violations of laws or rules adopted under the laws of New Hampshire, a political subdivision of this state, and/or the United States, in relation to the safety matters that affected all of the patients in the Oncology Clinic of FMP where Plaintiff worked, as described herein.

233.    As medical practices and/or hospitals employing physicians and other medical care providers, including but not limited to doctors like Plaintiff, Defendants were subject to state and federal laws which govern the provision of medical care, and in particular, oncology care, to patients in the State of New Hampshire with cancer, who seek oncology services.

234.    As described throughout the complaint, when Plaintiff raised multiple, serious concerns about the manner in which oncology services were provided to patients at the Clinic, she was immediately and shockingly retaliated against by all Defendants, including, but not limited to, being forced to resign as Medical Director, placed on two administrative leaves, being threatened with a report to the N.H. Board of Medicine, and given no choice but to resign from her employment.

235.    As a result of Plaintiff's good-faith actions, the Defendants wrongfully harassed, abused, and/or intimidated Plaintiff, and constructively terminated her employment, and Plaintiff has suffered, and continues to suffer, substantial injury and damage, and seeks relief including, but not limited to, reinstatement, back pay, and reasonable attorneys' fees and costs, all within the jurisdictional limits of this Court pursuant to RSA 275-E:2, II.

## COUNT X
## BREACH OF CONTRACT - MGPO, MGH, SNHMC

236.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

237.    Dr. Chun entered into an employment contract with MGPO, MGH, and SNHMC on August 17, 2017.  *See* Exhibit B.

238.    MGPO, MGH, and Southern New Hampshire Medical Center breached the Contract by constructively terminating Dr. Chun as described herein.

239.    Dr. Chun was damaged by their breach as described herein.

## COUNT XI
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
## MGH, MGPO, SNHMC

240.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

241.    The Contract allowed or conferred discretion on MGH, MGPO, and SNHMC to deprive Dr. Chun of a substantial portion of the benefit of her employment contract.

242.    MGH, MGPO, and SNHMC exercised their discretion unreasonably.

243.    MGH, MGPO, and SNHMC's abuse of discretion caused Dr. Chun damages as described herein.

**COUNT XII**
**TORTIOUS INTERFERENCE WITH AN ECONOMIC RELATIONSHIP**
**FMP, DR. MICHAEL DELEO**

244.    Plaintiff re-alleges and hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

245.    A claim for tortious interference with an economic relationship requires proof that "(1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." *Singer Asset Fin. Co.*, LLC v. Wyner, 156 N.H. 468, 478 (2007).

246.    Dr. Chun had an economic relationship with MGH, MGPO, and SNHMC.

247.    Dr. DeLeo and FMP knew of Dr. Chun's relationship with MGH, MGPO, and SNHMC.

248.    Dr. DeLeo and FMP intentionally and improperly interfered with this relationship as described herein.

249.    Dr. Chun was damaged by this interference as described herein.

Respectfully submitted,
NANCY CHUN, Plaintiff

By Her Attorneys
UPTON & HATFIELD, LLP

Date:  March 8, 2024              By:   /s/ Heather M. Burns
Heather M. Burns (NHBA #8799)
Brooke Lovett Shilo (NHBA #20794)
10 Centre Street
Concord, NH  03301
(603) 224-7791
hburns@uptonhatfield.com